J-S14017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.R.P. A/K/A A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2998 EDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000253-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.R.P. A/K/A A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2999 EDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-1000119-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S.P., JR. A/K/A M.P., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3000 EDA 2018 |

Appeal from the Decree September 6, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000254-2018

IN THE INTEREST OF:  M.S.P., JR. : IN THE SUPERIOR COURT OF
A/K/A M.P., JR., A MINOR : PENNSYLVANIA
 :
 :
 :
APPEAL OF: T.R., MOTHER :
 :
 :
 :
 :
 : No. 3001 EDA 2018

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-10000121-2016

IN THE INTEREST OF: S.E.D.P., : IN THE SUPERIOR COURT OF
A/K/A S.P., A MINOR : PENNSYLVANIA
 :
 :
 :
APPEAL OF: T.R., MOTHER :
 :
 :
 :
 :
 : No. 3002 EDA 2018

Appeal from the Decree September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000255-2018

IN THE INTEREST OF: S.E.D.P.., : IN THE SUPERIOR COURT OF
A/K/A S.P., A MINOR : PENNSYLVANIA
 :
 :
 :
APPEAL OF: T.R., MOTHER :
 :
 :
 :
 :
 : No. 3003 EDA 2018

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-1000123-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: G.H.I.P.<br>A/K/A G.P., A MINOR | : | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3004 EDA 2018 |

Appeal from the Decree September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000256-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: G.H.I.P.<br>A/K/A G.P., A MINOR | : | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3005 EDA 2018 |

Appeal from the Order Entered September 6, 2018
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-1000125-2016

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 07, 2019**

T.R. (Mother), files these consolidated appeals from the decrees granting the petitions of the Philadelphia Department of Human Services (DHS) to involuntarily terminate her parental rights to her dependent children, A.A.R.P., born in August 2010, M.S.P., Jr., born in August 2012,  S.E.D.P.,

---

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

born in July 2014, and G.H.I.P., born in September 2015 (collectively,
Children), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  Mother
further appeals from the orders changing Children's permanent placement
goal to adoption pursuant to 42 Pa.C.S. § 6351.  We affirm.

The trial court summarized the relevant procedural and factual history,
in part, as follows:

**Factual and Procedural Background:**

DHS originally became involved with this family in January 2010.
DHS has received numerous General Protective Services ("GPS")
and Child Protective Services ("CPS") reports regarding Children
and siblings between 2010 and 2014 for issues including hygiene
issues, inadequate medical care, lack of education, lack of
appropriate shelter, lack of essential nutrition, failure to provide
adequate clothing, failure to provide adequate supervision,
emotional harm, inappropriate discipline, injuries to Children,
Children playing with an unsecured gun, and concerns of sexual
abuse.  DHS implemented In Home Protective Services ("IHPS")
for family in Mother's home from December 2011 through April
2012.    Subsequently[,] DHS implemented the Community
Umbrella Agency ("CUA") Asociación de Puertorriqueños en
Marcha ("APM") IHPS for the family, which remained in place until
August 22, 2016.

On April 17, 2016, DHS received a CPS report which alleged that
on April 16, 2016, Father had left a gun unsecured in the home;
Sibling 3 had been shot in the chest and was pronounced dead in
the home at 2:30 P.M.; the home was infested with roaches, fleas,
and bed bugs; the condition of the bedrooms and bathroom was
poor; Children, Sibling 1, and Sibling 2 would be in the care of

---

[1] By separate decrees entered the same date, the trial court involuntarily
terminated the parental rights of the Children's father, M.S.P. (Father).  Father
has not filed an appeal of these orders and is not a party to the instant appeals.

We note that Children have additional step-siblings, referred to by the trial
court as "Sibling" or "Siblings."  None of the Siblings are subjects of this
appeal.

maternal grandparents following the incident. This report was indicated. On that same day, DHS and CUA went to the home of Mother and Father to investigate the allegations of the CPS report. CUA, maternal grandparents, Mother, and Children were present. Children stated that they were present in the home at the time of the shooting and Mother had not been home at the time of the shooting. . . .

On April 19, 2016, DHS visited maternal grandparents' home. Children stated that on the day of the incident, they were all in Mother and Father's bedroom with Father, who was handling the gun, and that Children observed the bullet strike Sibling 3.[2] Mother admitted to DHS that she knew Father's gun was in the home. Mother denied a history of domestic violence with Father and denied any knowledge of Father's mental health issues, but admitted that she knew that he smoked marijuana on a daily basis. . . .[3]

On April 21, 2016, DHS received a CPS report regarding Father's behavior on April 17, 2016. On April 26, 2016, DHS received a supplemental report alleging that Sibling 3 had fallen from a window in 2014;[4] Mother would hit Children; Mother did not provide for Children's basic needs and rarely fed them; and that there was concern for Children because they may [be] in Mother's care.

On April 28, 2016, [M.S.P., Jr.] and [S.E.D.P.] received medical evaluations at St. Christopher's Hospital, where they were found to have extensive scarring, including healed loop-shaped marks on [M.S.P., Jr.]'s body. The hospital staff was concerned that Mother did not recognize the healed injuries and that she might be cognitively delayed. On that same day, DHS visited Mother's home. Mother stated that on the day of the shooting, she observed Father with the gun and told him to remove it from the

_____

[2] Subsequent to the shooting, Father assaulted A.A.R.P. and attempted to blame the shooting on her. N. T., 5/21/18, at 41.

[3] Father was incarcerated at the time of the hearing for charges relating to the death of Sibling 3, including third degree murder. *See* N.T., 5/21/18, at 41; *see also* N.T., 9/6/18, at 14; DHS Ex. 12.

[4] In some places of the certified record, it is suggested that Sibling 3 fell from a window, while in others, it is suggested this was M.S.P., Jr.

house. Mother initially stated to DHS that she had only seen a gun in the home on that one occasion, but she subsequently stated that Father had a shotgun in the home in the past. Mother also stated that she had disposed of an empty lockable box from the bedroom closet on April 20, 2016. Mother denied any knowledge of [M.S.P., Jr.] and [S.E.D.P.]'s scars and old injuries; observing any injuries to Children after they had been in Father's care; and a history of domestic violence. On May 27, 2016, an adjudicatory hearing was held for Children. The trial court adjudicated Children dependent, ordered DHS to supervise, and granted temporary legal custody ("TLC") of Children to maternal grandparents. Mother was to be referred to Family School and was ordered to complete the second half of her Parenting Capacity Evaluation ("PCE"). Additionally, Mother was ordered to have liberal [supervised] visits with Children in the home of maternal grandparents.

Mother completed her PCE on July 22, 2016. Forensic Psychologist, William Russell, Ph.D. . . . concluded that based on Mother's housing, income, minimization of concerns, and projection of responsibility, Mother does not have the capacity to provide Children with safety and permanency. Mother was also diagnosed with a mild intellectual disability. [Dr. Russell] recommended that Mother be referred for Intellectual Disability Services; Mother participate in mental health therapy; Mother should participate in any psycho-education classes regarding parenting skills; Mother's neurologist provide clarification regarding her seizures; Mother receive assistance in obtaining appropriate housing; Mother should be assisted in filing for support for Children from their respective [f]athers; Children should not be allowed to accompany Mother on any jail visits with Father; and that Children's functioning should be reviewed to ensure Children are receiving appropriate educational services.

On August 23, 2016, a permanency review hearing was held for Children. Mother was present for this hearing. Mother testified that she had been sexually abused by Maternal Grandfather when she was a teenager; that the sexual abuse resulted in Mother's pregnancy; and that the child was subsequently placed for adoption. The trial court ordered that DHS obtain an Order of Protective Custody ("OPC") for Children and that they be placed in general foster care, not with family members. An OPC was obtained for Children, Sibling 1, and Sibling 2. [A.A.R.P.], [M.S.P., Jr.], and [S.E.D.P.] were placed in a foster home through Tabor Northern and [G.H.I.P.] was placed at Baring House Crisis

- 6 -

Nursery. On August 25, 2016, a shelter care hearing was held for Children. The OPC was lifted, the temporary commit[ment] to DHS was discharged, and Children were committed to DHS.[5]

Trial Ct. Op., 12/19/18, at 2-5 (citations to record and footnotes omitted).

Permanency review hearings were held on December 6, 2016, March 7, 2017, and May 25, 2017. Children remained committed to DHS during this time. Notably, on May 25, 2017, DHS was ordered to have an addendum to Mother's PCE completed. Permanency Review Order, 5/25/17, at 2. Thereafter,

[o]n June 17, 2017, Mother was arrested and charged with conspiracy and the manufacture, delivery, or possession of a controlled substance with intent to manufacture or deliver. On August 18, 2017, a permanency review hearing was held for Children. The trial court found Mother to be moderately compliant with the permanency plan. Mother was referred to the Clinical Evaluation Unit ("CEU") for a forthwith drug and alcohol screen, dual diagnosis and assessment, and three random drug screens prior to the next court date. Mother was also ordered to be referred to an Intensive Case Manager ("ICM"). Mother was ordered to continue supervised visitation with Children. On September 14, 2017, DHS received a Urine Drug Screen ("UDS") test result for Mother and Mother's opiate level was greater than 2,000 ng/ml. On October 27, 2017, DHS received a CEU report for Mother, which recommended a referral to [Behavioral Health Services (BHS)] due to Mother's reported mental health history. The CEU report did not recommend drug and alcohol treatment for Mother.

On November 27, 2017, a status review hearing was held for Children. The trial court heard testimony regarding the

---

[5] At the time of the termination/goal change hearing, A.A.R.P. was placed separately in a treatment foster home. N.T., 9/6/18, at 17. M.S.P., Jr. was placed in a treatment foster home with Sibling 1. *Id.* at 19. S.E.D.P. and G.H.I.P. were placed together in a general foster home. *Id.* at 21.

appropriateness of Mother's visitation with Children. The testimony indicated that Mother was unable to handle Children during supervised visitation, and may be engaging in unauthorized contact with Children outside the parameters of the trial court's orders. The trial court ordered that Mother's visits were suspended until reinstatement was recommended by Children's treatment providers;[6] that a copy of Mother's PCE addendum be provided to all parties when available; that recommendations of Mother's PCE be implemented; that Mother be referred to the CEU for a forthwith drug and alcohol screen, monitoring, and three random drug screen[s] prior to the next court date. Mother has not attended therapy for her mental health issues since December 2017. On December 20, 2017, Mother pleaded guilty to conspiracy and the manufacture, delivery, possession of a controlled substance with intent to manufacture or deliver, in relation to her June 17, 2017 arrest. On February 20, 2018, Mother was sentenced to three years' probation.

On March 12, 2018, DHS received an addendum to Mother's PCE from [Dr. Russell that] indicated that due to Mother's ongoing noncompliance, difficulty managing Children's behaviors, and drug use, Mother does not possess the ability to provide safety or permanency to Children. The PCE addendum recommended that Mother maintain ongoing sobriety and continue to participate in random urine drug screens; that after a period of no less than six months of clean urine drug screens, Mother's visitation can be reconsidered; that Mother participate in the recommended caregiver sessions prior to visitation being reconsidered; that Mother should re-enroll and comply with mental health treatment, with a focus on helping Mother examine her role in Children's removal and developing her parenting skills; that Mother [should] obtain appropriate housing and maintain the cleanliness of the home; and that Mother [should] develop a sustainable financial plan that takes into account her needs and the needs of Children.

Trial Ct. Op. at 5-7 (citations to record and footnotes omitted).

_____

[6] Mother's visitation with Children had been supervised at DHS since August 25, 2016. *See* Permanency Review Order, 8/25/16, at 1.

On March 28, 2018, DHS filed petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and to change Children's goal to adoption. The trial court held a hearing on DHS's petitions on May 21, 2018, and September 6, 2018.[7] In support thereof, DHS presented the testimony of Dr. Russell, the forensic psychologist who conducted a parenting capacity evaluation and addendum of Mother, Robin Hill, a DHS social worker, and Trish Campbell, a supervisor with Court Appointed Special Advocates (CASA).[8] DHS additionally presented DHS Exhibits 1 through 12, which were admitted without objection. N.T., 9/6/18, at 9-12, 35. Mother who was present and represented by counsel, testified on her own behalf. Children were represented by counsel during this proceeding.[9]

---

[7] The focus of the May 21, 2018 hearing was on Sibling 1 and Sibling 2. The court then concentrated on Children during the September 6, 2018 hearing. In so doing, the testimony from the May 21, 2018 hearing was, however, incorporated by the court at the September 6, 2018 hearing and admitted as DHS Exhibit 4. N.T., 9/6/18, at 11-12. We observe that the exhibits marked and admitted at the May 21, 2018 hearing are not included with the certified record. Notably, some of those relevant exhibits were re-marked and admitted at the September 6, 2018 hearing (Dr. Russell's curriculum vitae, report, and addendum) or read into the record on May 21, 2018 (CEU report).

[8] Dr. Russell testified on May 21, 2018. Ms. Hill testified on both May 21, 2018 and September 6, 2018. Dr. Russell's report, dated July 22, 2016, was admitted as DHS Exhibit 6 on September 6, 2018. The addendum, dated March 12, 2018, was admitted as DHS Exhibit 7.

[9] Children were represented by a guardian *ad litem*, Lisa Visco, Esq., and legal counsel, Mario D'Adamo, III, Esq., who both participated in the proceedings. Attorney D'Adamo indicated that his file contained a notation that he met with

By decrees entered September 6, 2018, the trial court involuntarily terminated the parental rights of Mother to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed their permanent placement goal to adoption.[10]  On October 5, 2018, Mother, through appointed counsel, filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following questions on appeal:

_____

children.  N.T., 9/6/18, at 45.  Both Attorney D'Adamo and Attorney Visco supported termination of Mother's parental rights and argued for such at the conclusion of the hearing on September 6, 2018. *Id.* at 44.  Attorney Visco additionally filed a brief with this Court in support of termination of Mother's parental rights.  Attorney D'Adamo did not file a brief.

As to M.S.P., Jr., and A.A.R.P., the evidence indicates that their preference was to remain in their current foster home and be adopted, respectively. *Id.* at 17-18, 20-22, 32.  As to S.E.D.P. and G.H.I.P., they were approximately four and three years old, respectively, at the time of the September 6, 2018 hearing.  Ms. Hill, when questioned by Ms. Visco, suggested that S.E.D.P. and G.H.I.P. were too young to have a preference as to adoption. *Id.* at 32.  Based on that testimony, the trial court also found that they were too young to express their preferences. *See* Trial Ct. Op. at 22.

We find the requirements of 23 Pa.C.S. § 2313(a) were satisfied. ***See In re Adoption of L.B.M.***, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); ***see also In re T.S.***, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests).

[10] This decree memorialized the decision placed by the court on the record at the conclusion of the hearing on September 6, 2018.  N.T., 9/6/18, at 46-47.

- 10 -

[1]. Whether the trial court committee reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa.C.S.[] § 2511 (a)(1), (a)(2), (a)(5), and (a)(8)?

[2]. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of [C]hildren as required by the Adoption Act 23 Pa.C.S.[] § 2511(b)?

[3]. Whether [t]he [t]rial [c]ourt erred and [a]bused [i]ts [d]iscretion [w]hen [i]t [c]hanged [t]he [g]oal [t]o [a]doption because the goal of adoption was not in the best interest of [C]hildren?

Mother's Brief at 3-4.

Mother, in her first two questions, challenges the trial court's ruling that termination of her parental rights was appropriate under Section 2511(a) and (b).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of*

***Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)). We have long held that in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(2) provides:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

As to Section 2511(a)(2), Mother argues that she attempted to comply with her objectives and commitment to Children. Mother's Brief at 6-7. Mother also asserts:

> In the instant matter, evidence demonstrates [M]other's attempt at trying to comply with objectives in order to reunify with [C]hildren, although [C]hildren were not in her care. Mother completed a housing program as well as parenting classes. . . . Mother has demonstrated her commitment to [remain] close to [C]hildren because she had a good relationship with [C]hildren.

> The visits with [C]hildren went well and [Sibling 1 and Sibling 2[11]] wanted to reunify with [M]other.

*Id.* (citations to record omitted).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *A.L.D.*, 797 A.2d at 340 (citations and quotation marks omitted).

---

[11] As referenced above, Sibling 1 and Sibling 2 are not subjects of the instant appeal.

- 14 -

Instantly, in finding grounds for termination of Mother's parental rights

pursuant to Section 2511(a)(2), the trial court stated:

Throughout the time that [C]hildren have been in the custody of DHS, Mother's SCP objectives were to consistently attend counseling, follow the recommendations of her therapist, participate in caregiver sessions at CCTC to be eventually incorporated into Children's therapy, participate in any clinical and educational meetings for Children to sign appropriate paperwork, complete random drug screens, secure appropriate housing, attend ARC for parenting and employment, complete a PCE, and attend visitation with Children when visitation was not suspended. Mother stopped attending individual therapy in December 2017 and Mother did not re-engage until approximately one week prior to the termination trial. Mother testified that she stopped attending individual therapy because she felt as though she did not need therapy. DHS indicated that Mother blamed her lack of engagement on receiving a new phone number and interpersonal issues with her family. Mother's therapy was to help address her relationship issues, issues regarding her parenting, and any objectives that Mother needed to address regarding the safety of Children. Mother misled DHS to believe that she was still attending individual therapy when she had actually stopped attending. Mother has participated in two caregiver sessions, but Mother was not consistent with her attendance. Mother was referred to caregiver sessions because[,] although she completed parenting through ARC, there were still concerns regarding her ability to parent. DHS had trouble scheduling caregiver sessions with Mother because Mother changed her phone number and was unreachable for multiple weeks. Mother typically attends the educational meetings for Children and signs the appropriate paperwork. Mother tested positive for opiates at over six times the cutoff limit just one day after attending a scheduled visit with Children. Mother did attend all random drug screens. Mother also plead guilty to a drug trafficking charge in February 2018, and is currently on probation. Mother's current home is not appropriate for Children[.] This home is not appropriate due to the trauma Children experienced after watching the death of Sibling 3. Mother has completed the housing workshop through ARC, but Mother has not indicated that she has sought different housing. Instead, Mother has indicated that she was working on rehabilitating the home. Mother was evicted from her home in

August 2018, and is currently residing with a family friend. Mother did complete parenting in 2016, but there are still concerns as to Mother's ability to parent. Due to the concerns about Mother's parenting, Mother was asked to re-engage with ARC for parenting and to participate in caregiver sessions. Mother completed the job training program at the ARC, but when she re-engaged at the ARC for a second time to increase her income, Mother stopped attending. Mother completed the PCE in 2016 and an addendum to the PCE ("Addendum") in March 2018. The Addendum indicates that due to Mother's ongoing noncompliance, Mother's difficulty managing Children's behavior, and concerns of Mother's drug use, Mother does not possess the ability to provide safety or permanency to Children. [Dr. Russell] indicated that one of the concerns during the evaluation was that Mother was not forthcoming. Mother indicated that she was attending therapy, although she was not, and . . . she had not disclosed her drug use or her drug-related arrest. Mother had also not followed up with the Department of Intellectual Disabilities, as previously recommended in the PCE. During the PCE and Addendum, Mother completed the MMPI-2, but due to Mother's cognitive deficiencies, the test results were invalid. Following the completion of the Addendum, [Dr. Russell] recommended that Mother maintain ongoing sobriety as well as participate in random drug screens; visitation should not be revisited until Mother has provided at least six months of clean drug screens; Mother should re-enroll and comply with mental health treatment with the focus on her role in Children's removal related to neglect of their basic needs, medical needs, and inability to sustain the condition of her home; Mother should participate in caregiver sessions before visitation should be reconsidered; Mother should obtain appropriate housing and maintain the cleanliness of the home; and Mother should develop a sustainable financial plan that, takes account [of] her needs and the needs of Children. [Dr. Russell] testified that Mother was provided with all of the appropriate referrals and recommendations, when necessary. Mother's visits with Children were suspended in November 2017 until otherwise recommended by the therapist. Prior to the suspension, Mother had supervised visits with Children. Although Mother consistently visited Children prior to the suspension of the visits, Mother's visits with Children were described as "chaotic." Mother had to be constantly redirected to properly supervise the visits. Many times, DHS had to step in to protect the safety of Children. Mother would often remain seated, although she was consistently instructed to get up and engage with Children. Mother struggled to address the

individual needs of Children, which is why it was recommended for Mother to participate in caregiver sessions instead of supervised visitation. Mother admitted to acting inappropriately during visits with Children by asking Children to forgive Father on more than one occasion. Mother has been moderately compliant with her goals. Mother was initially substantially compliant with her objectives, but Mother's compliance has dropped over time. Mother needed assistance to complete her goals, but she was offered all of the appropriate services referrals and support by DHS. Children need permanency, which Mother cannot provide. Even when Mother had supervised visits, Mother had to be directed to provide for Children's needs. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity to parent[ i]n order to provide Children with essential parental care, control, or subsistence necessary for their physical and mental well-being. The conditions and causes of Mother's incapacity cannot or will not be remedied by Mother. Mother does not exhibit the mental capacity to safely parent and supervise . . . Children. Termination under 23 Pa.C.S.[] § 2511(a)(2) was also proper.

Trial Ct. Op. at 11-14 (citations to record omitted).

Our review establishes the trial court's finding of grounds for termination under Section 2511(a)(2) was supported by the record. The record reveals that Mother failed to comply with her established family service plan goals, N.T., 9/6/18, at 25-29, and lacked the capacity to provide for Children's permanency and welfare, N.T., 5/21/18, at 25. Ms. Hill, the DHS social worker, testified that Mother's compliance with her family service plan goals, which included participation in individual therapy, participation in caregiver sessions with Children's therapists, and maintenance of safe and appropriate housing, was minimal. N.T., 9/6/18, at 25, 29. In particular, Ms. Hill highlighted Mother's lack of consistent engagement in individual therapy. *Id.* at 26-27. She expressed that Mother's failure in this aspect was "a huge

concern, because that was one of the primary goals, for mom to continue engage [sic] her own emotional needs." *Id.* at 27.

Ms. Hill indicated her belief that Children could not safely be returned to Mother. *Id.* at 29. Ms. Hill explained:

> Because I have concerns regarding [M]other's mental stability, the fact that she hasn't engaged in therapy consistently, and then also just the issues regarding the reports that we received previously. We're still trying to work through the trauma issues with the kids regarding [their sister's death] and the severe neglect in the home, the educational neglect as well. That's why so many of the kids are behind academically, that's why they have IEPs and they need special services. And I'm not sure that mom -- even though she attended meetings in the past, over a period of time, I'm not sure that mom would consistently be able to follow-up with those things as far as academics and also as far as the mental health treatment of [C]hildren, because she's not following up with her own mental health.

*Id.*

Ms. Hill also expressed concern as to Mother's parenting capacity, noting the need to redirect Mother constantly during visitations. N.T., 5/21/18, at 67. Ms. Hill stated, in part: "[M]y concern was[,] even though [Mother] had completed parenting[,] she still seemed to lack the appropriate like parental guidelines and information to actually supervise [C]hildren." *Id.*

Moreover, Dr. Russell opined that Mother lacked the capacity to provide safety and permanency to Children. *Id.* at 25. In his addendum, Dr. Russell stated: "Due to [Mother]'s ongoing noncompliance and ongoing difficulty managing [C]hildren's behavior in a limited setting and potential concerns of drug use, [Mother] does not possess the ability to provide safety or permanency to [C]hildren." DHS Ex. 7, at 8 (unpaginated). Dr. Russell did

- 18 -

not anticipate Mother would be able to obtain such capacity. N.T., 5/21/18, at 29.

Therefore, the record substantiates the trial court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. As this Court has stated: "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, we discern no error in the trial court's conclusion that termination of Mother's parental rights was proper under Section 2511(a)(2).

Mother next argues that the trial court erred in terminating her parental rights to Children under Section 2511(b). Mother's Brief at 8-12. Mother emphasizes her testimony that she has bonds with Children, that they call her "Mom," and that they appeared happy to see her at visits. *Id.* at 9. Mother claims that the trial court erred in failing to consider those bonds and how termination of those bonds would affect the welfare of Children. *Id.* at 12.

Section 2511(b) provides:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our Supreme Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***C.D.R.***, 111 A.3d at 1219 (citations and quotation marks omitted).

In finding that Children's emotional needs and welfare favor termination pursuant to Section 2511(b), the trial court reasoned as follows:

Mother's visits with Children were suspended in November 2017 until otherwise recommended by the therapist. Prior to the suspension, Mother had supervised visits with Children. Although Mother consistently visited Children prior to the suspension of the visits, Mother's visits with Children were described as "chaotic." Mother had to be constantly redirected to properly supervise the visits. Many times, DHS had to step in to protect the safety of Children. Mother would often remain seated, although she was consistently instructed to get up and engage with Children. Mother struggled to address the individual needs of Children, which is why it was recommended for Mother to participate in caregiver sessions at CCTC instead of supervised visitation. Mother admitted to acting inappropriately during visits with Children by asking Children to forgive Father on more than one occasion. Mother has been moderately compliant with her goals. Mother was initially substantially compliant with her objectives, but Mother's compliance has dropped over time. Mother needed assistance to complete her goals but she was offered all of the appropriate services referrals and support by DHS. [A.A.R.P.] is currently placed in a treatment level foster home, due to the

trauma experienced from Sibling 3's death. Child is bonded with her foster parent and has asked to be adopted by the foster parent. Foster parent participates in Child's therapeutic and educational services. [A.A.R.P.] looks to foster parent to meet her day-to-day needs. [M.S.P., Jr.] is currently placed in the same treatment level foster home as Sibling 1. [M.S.P., Jr.] is bonded with Sibling 1 and has a positive relationship with the foster parent, which is a pre-adoptive home. The foster parent has been fully participating as [M.S.P., Jr.]'s educational decision maker and makes sure that [M.S.P., Jr.] consistently attends weekly therapy. [M.S.P., Jr.] indicated that he wants to continue living in this home. [M.S.P., Jr.] refers to the foster parent as "mommy." [S.E.D.P.] and [G.H.I.P.] are currently in a pre-adoptive home together. [S.E.D.P.] and [G.H.I.P.] are very bonded to the foster parent. The foster parent makes sure that [S.E.D.P.] and [G.H.I.P.]'s needs are being met[.] Children were appointed legal counsel and a Court Appointed Special Advocate. Children's legal counsel met with Children and confirmed that [A.A.R.P.] and [M.S.P., Jr.] want to stay with their caregivers. [A.A.R.P.] has actually asked to be adopted. [M.S.P., Jr.] is not mature enough to provide his wishes as to adoption, but he has made it clear that he wants to stay in his pre-adoptive home with Sibling [1]. As to [S.E.D.P.] and [G.H.I.P.], they are happy in their pre-adoptive home, but they are not mature enough to provide their wishes as to adoption. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Mother. Mother has had no visits since November 2017. Mother's visits are at the recommendation of Children's therapist, CCTC. In order for CCTC to determine whether Mother's visits must resume, Mother must be consistent in the caregiver sessions. Children have bonded to their foster parents and their other siblings in the home. Although Children may recognize Mother, their bond with Mother is very attenuated. It is not a parent/child bond. The DHS witnesses were credible. The trial court's termination of Mother's parental rights to [C]hildren under 23 Pa.C.S.[] § 2511(b) was proper and there was no error of law or an abuse of discretion.

Trial Ct. Op. at 21-23 (citations to record omitted).

The record supports the trial court's finding that Children's developmental, physical and emotional needs and welfare favor termination

of Mother's parental rights pursuant to Section 2511(b). Critically, despite Mother's assertion of a bond with Children, Mother's visits with Children were suspended on November 27, 2017. N.T., 9/6/18, at 39-40; N.T., 5/21/18, at 46. Mother's visitation was to remain suspended until Children's treatment provider recommended reinstatement, which never occurred. N.T., 9/6/18, at 28; N.T., 5/21/18, at 46, 74-75. Although not described as inappropriate, Mother's visitation with Children prior to suspension were referred to by Ms. Hill, as well as by Mother herself, as "chaotic." N.T., 5/21/18, at 93, 126. Further, Ms. Hill, explained: "It was . . . a matter of [Mother] needing to know how to address the individual needs of [C]hildren. . . . There were safety concerns because [Mother] did not know how to address the specific safety needs of [C]hildren." *Id.* at 103-04.

Moreover, Ms. Hill testified that Children were doing well in their placements, which were pre-adoptive,[12] and had positive relationships with their respective foster parents.[13] N.T., 9/6/18, at 17-18, 20-22, 32. As such, Ms. Hill opined that it was appropriate to recommend permanency through adoption, indicating no harm would result to Children if Mother's parental rights were terminated. *Id.* at 30. Ms. Hill further offered that it was in Children's best interests to stay with their current caregivers and be adopted. She explained: "[T]he kids are doing so well emotionally, physically, and I've

---

[12] M.S.P., Jr.'s placement is tentatively pre-adoptive. N.T., 9/6/18, at 20, 33.

[13] Ms. Hill further testified that M.S.P., Jr., was bonded with his older Sibling with whom he was placed. *Id.* at 19.

just seen a tremendous positive change in their mental health. So[,] I just really believe it's in their best interest to stay with their current caregivers and be adopted." *Id.* at 31.

When asked if Children want to be adopted, Ms. Hill responded,

The two youngers [sic] ones, they're too young to -- but with [M.S.P., Jr.], he calls [foster mother] mommy and he feels very comfortable in the home. And I know that he would love to stay there. He's the happiest I've ever seen him. And then of course, with [A.A.R.P.], she requested that right in front of me during a visit, so she definitely wants to be adopted.

*Id.* at 32.

Similarly, when asked by legal counsel for Children about M.S.P., Jr., and A.A.R.P.'s preferences, Ms. Hill continued,

[M.S.P., Jr.] didn't say he wants to be adopted. It's -- we are not at that point where we are asking him that question only because it's a pre-adoptive situation, but [foster mother] has not made the final decision yet and he just turned six, so we don't want to get him confused. He's very happy in the home. He's made it clear he wants to stay there and his older sibling is there. [A.A.R.P.] is eight, so yes, she definitely understands and she's made that request.

*Id.* at 33.

Likewise, Ms. Campbell, a CASA supervisor, indicated that

[C]hildren are doing exceptionally well in their placements. We agree with Ms. Hill that [M.S.P., Jr.] is the happiest he's ever been, the most stable, really making significant improvement. We were actually just talking out there, just the stability [C]hildren are in now is pretty astounding given all that they've been through and they all love where they are. They love their caregivers. We're in complete agreement with moving forward with adoption for all of them.

*Id.* at 43.

- 24 -

Thus, the record confirms the trial court's finding that termination of Mother's parental rights serves Children's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See Z.P.*, 994 A.2d at 1121. At the time of the hearing, Children had already been in care for approximately twenty-four months, and are entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Lastly, Mother asserts that "the permanent loss of . . . Children's vital relationship with [M]other did not serve their best interests, and instead harmed . . . Children." Mother's Brief at 13. Mother suggests that DHS failed to present clear and convincing evidence regarding Children's emotional bonds to her and the effects termination would have on Children. *Id.*

Our standard of reviewing whether the trial court's decision to change a permanency goal to adoption is the same abuse of discretion standard as noted above. **See In the Interest of L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015) (citing **R.J.T.**, 9 A.3d at 1190, for the proposition that the abuse of discretion standard applies in a dependency matter); **see also In re S.B.**, 943 A.2d 973, 977 (Pa. Super. 2008)).

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

**In re A.B.**, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1)  Additional   determination.—**Based   upon   the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

> \* \* \*

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

Upon review of the record, a challenge to the goal change lacks merit. The record reveals that a change of the permanency goal to adoption was in Children's best interests. Mother had failed to complete her family service plan goals, most importantly attendance at individual therapy, and was unable to provide for Children's permanency and safety and not anticipated to acquire this capacity. N.T., 9/6/18, at 25-29; N.T., 5/21/18, at 25, 29. Moreover, Children had been in care for approximately two years and had not visited with Mother for almost one year. N.T., 5/21/18, at 46. The evidence established that they were doing well and bonded with their respective foster parents. N.T., 9/6/18, at 17-18, 20-22, 32. Notably, M.S.P., Jr., was described as having made great strides and the "happiest he's ever been" and A.A.R.P. specifically requested to be adopted. *Id.* at 32, 43. Therefore, the record supports that a goal change was in the best interests of Children. Accordingly, after review of the record, we again discern no abuse of discretion, and conclude that the trial court properly changed Children's permanent placement goal to adoption.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's

parental rights under 23 Pa.C.S. § 2511(a)(2) and (b) and changed Children's permanent placement goal to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/7/19